IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR KENT COUNTY

| | | |
|---|---|---|
| LARRY D. MARVEL, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. |
| | : | |
| PRISON INDUSTRIES (a/k/a State of | : | Non-Arbitration Case |
| Delaware Department of Correction), | : | |
| | : | |
| Defendant. | : | |

## COMPLAINT

1.  This action seeks monetary damages for Plaintiff's injuries sustained while working as an inmate employee of Prison Industries and the State of Delaware Department of Correction. The injuries include Plaintiff's contraction of reactive airways disease and vasomotor rhinitis resulting from his unprotected exposure to harmful toxins at Prison Industries' Auto-Body Shop.

### JURISDICTION

2.  This Court has jurisdiction over this complaint pursuant to 10 *Del. C.* § 8118.

3.  Plaintiff filed a timely action against Defendant in or about February 1997 in the United States District Court for the District of Delaware, styled *Marvel v. Prison Industries, et al.*, C.A. No. 99-113-GMS (the "Federal Action").

4.  Defendant was represented by counsel and moved to dismiss that portion of the Federal Action asserted against it pursuant to, *inter alia*, the Eleventh Amendment of the United States Constitution.

5.  On March 15, 2004, Plaintiff conceded that subject matter jurisdiction was lacking for the Federal Action asserted against Defendant and that portion of the Federal Action was abated by reason of jurisdiction.

6.  To date, the United States District Court has yet to issue a final order on the abatement of the Federal Action asserted against Defendant.

## PARTIES

7.  Plaintiff, Larry D. Marvel, is presently incarcerated at the Delaware Correctional Center (the "DCC"), Paddock Road, Smyrna, Delaware 19977.

8.  Defendant, Prison Industries, at all times material, was an operating arm of the State of Delaware, Delaware Department of Correction ("DOC" or "State"), and the DCC, and was engaged in various business ventures, including the Auto-Body Shop. Prison Industries acted through its various employees including, but not limited to: (i) Stanley Taylor ("Taylor"), the Commissioner of the Department of Correction; (ii) David Kalili ("Kalili"), the Director of Prison Industries; (iii) Edward Bower ("Bower"), the Operations Manager of Prison Industries; and (iv) Edward Moore ("Moore"), the work-site supervisor for Auto-Body Shop.

## FACTS

### A.  **Introduction**

9.  At some time not known to Plaintiff, the DOC operated an Auto-Body Shop at the DCC. On information and belief, that shop ceased operation around 1989. In or about 1992, unknown State officials decided to resurrect the Auto-Body Shop at the DCC.

10.  The resurrected Auto-Body Shop engaged in, among other activities, the restoration, conversion, painting and refinishing of motor vehicles brought there by the State of Delaware, the DOC, correctional officials and officers, and the general public.

11.  Prior to his incarceration, Plaintiff had experience in the auto-body refinishing trade. His participation in the Auto-Body Shop was therefore important to the success of that endeavor.

12. Because Plaintiff's skills were necessary, he was coerced into working in the Auto-Body Shop, even though Defendant knew or should have known that it was unsafe to work in that shop under the conditions then existing. As a result of Defendant's conduct, Plaintiff has suffered permanent physical injuries.

### B. The DOC Refuses to Provide Necessary Safety Equipment

13. The Auto-Body Shop had been closed for approximately three years when, on or about November 1, 1992, Prison Industries' work-site supervisor Edward Moore told Plaintiff to supply him with a list of items needed to restart operations at the shop.

14. Following the orders of Moore, Plaintiff contacted a supplier of products relating to auto-body refinishing, Wharton & Barnard, Inc., formerly of Milford, Delaware, which supplied the entire Delaware area with vehicle refinishing products from E.I. DuPont de Nemours and Company, Inc. ("DuPont"). The DuPont refinishing products were required for the work contemplated by the Auto-Body Shop.

15. After obtaining the current prices of the items required to re-start the Auto-Body Shop, Plaintiff submitted the list of items to Moore and Bower. This list included demands for safety equipment required to meet the health and safety requirements for the DuPont products, including a positive-pressure fresh air supplied respirator and an eye protective full-face mask (the "Required Safety Devices").

16. The chemicals and solvents used in the Auto-Body Shop carried warnings that repeated and prolonged overexposure to the solvents may lead to permanent brain damage, respiratory distress and nervous system failure. The warnings also provided that the user must wear a positive pressure supplied air respirator, eye protection, gloves and protective clothing

3

during the application process and until the vapor and spray mist dissipated. Representatives of Wharton & Barnard indicated such to the correctional officers placed in charge of Plaintiff.

17. Specifically, a Material Safety Data Sheet ("MSDS sheet") for one product used in the Auto-Body Shop stated: "Overexposure may cause asthma-like reactions with shortness of breath, wheezing, cough, which may be permanent, or permanent lung cessation. This effect may be delayed for several hours after exposure. Repeated exposure may cause allergic skin rash, itching, swelling. May cause eye irritation with discomfort, tearing or blurred vision. Repeated overexposure to isocynates may cause lung injury, including a decrease in lung function, which may be permanent." (Exhibit A).

18. Further, the MSDS sheet stated that "sufficient ventilation [be provided] in volume and pattern to keep contaminants below applicable exposure limits." (Exhibit A).

19. The MSDS sheet stated that the painter must wear "a positive-pressure supplied air respirator" when isocynate containing products were utilized. (Exhibit A).

20. The DOC was required by applicable federal and State laws and regulations to keep and post MSDS sheets for the chemicals used in the Auto-Body Shop.

21. The MSDS sheets were never posted at the Auto-Body Shop for inmate inspection.

22. Bower then took the list of required items, including the request for the Required Safety Devises to Kalili at Prison Industries' operations office at the DCC. After review, Bower and Kalili ordered Moore to delete the positive-pressure fresh air supplied respirator and eye protective full-face mask from the list.

4

23. Thereafter, Plaintiff inquired why the needed safety equipment was taken off of the required items list. Moore indicated that Kalili ordered these items taken off, stating, "they have never needed that stuff before and they don't need it now."

24. Kalili testified:

> Q. Did anyone working in the spray booth, whether it be Larry Marvel or anyone else –
>
> A. Require a fresh air supply breathing apparatus of some sort?
>
> Q. Correct.
>
> A. I go back again and I say that there was never any requirement that said that that was needed. Thus they didn't get one.
>
> Q. What requirements are you referring to?
>
> A. What requirement? The requirements was in my capacity that I was never -- I was asked, but I was never given justification that it was a requirement, a safety requirement that that was the only thing that was needed.

(Exhibit B (Deposition of David Kalili at p. 39-40)).

25. Confirming the testimony of Kalili, Moore stated that he did raise the respirator issue with his superiors.

26. Moore testified: "Q. What concerns weren't addressed by the fresh water system? A. The respirator issue... Q. Had you voiced these concerns to Mr. Bowers [sic]? A. Yes. Q. Did you voice these concerns to Mr. Kahlili [sic]? A. Yes." (Exhibit C (Deposition of Edward Moore at p. 35-36)).

27. On or about June 1993, Plaintiff was again asked to compile a required items list of necessary items for the Auto-Body Shop in order to disburse surplus budget monies prior to the fiscal year end on July 1, 1993. Again, Plaintiff demanded the Required Safety Devices in order to comply with the manufacturer's safety requirements and the rules, regulations and safety

5

standards set forth by the Occupational Safety and Health Administration ("OSHA") for the proper use of the vehicle refinishing products.

28. Plaintiff was informed by Moore that both Kalili and Bower would not allow the purchase of the Required Safety Devices even though their use was mandated by the MSDS sheets for the DuPont products used at the Auto-Body Shop.

29. Plaintiff continued to use the negative pressure charcoal-filtered mask and goggles previously provided to him by the State.

30. Prior to fiscal year end on July 1, 1994, Plaintiff was again asked to compile a required list of necessary items to help disburse the surplus budget monies. Plaintiff again requested that the Required Safety Devices be purchased to ensure that work could be safely undertaken at the Auto-Body Shop, but this request was denied.

31. Prior to fiscal year end on July 1, 1995, Plaintiff was asked to compile a required list of necessary items to help disburse the surplus budget monies. Plaintiff requested that provision be made for the Required Safety Devices. This request was again denied.

32. Prior to fiscal year end on July 1, 1996, Plaintiff was asked to compile a required list of necessary items to help disburse the surplus budget monies. Plaintiff again requested that the Required Safety Devices be purchased. Again, this request was denied. Plaintiff continued to use the negative pressure charcoal-filtered respirator and goggles as no other safety devices were provided, despite these repeated requests.

33. By failing to provide the Required Safety Devices, the DOC, while not formally required to adhere to the regulations, was nonetheless operating the Auto-Body Shop in violation of OSHA standards and regulations.

WILM1\28988\1 095562.000

34. OSHA's standards and regulations evidence a basis for the standard of care all employers should provide for their employees.

35. Plaintiff was ordered to work without the required safety equipment or be terminated from his employment with Prison Industries for failure to obey an order, abuse of privileges and other miscellaneous disciplinary infractions. Had Plaintiff been terminated from his job with Prison Industries, he would have lost the opportunity to acquire good time credit toward his early release from prison.

36. Although Plaintiff was compensated, his work at the Auto-Body Shop was compulsory pursuant to 11 *Del. C.* § 6532.

37. From the time the Auto-Body Shop was re-established in 1992 until approximately late 1996 or 1997, the only means of air intake ventilation for the spray booth was through cracks in the door.

38. The State knowingly made its decision to not provide Plaintiff with the Required Safety Devices or adequate ventilation with full knowledge that Plaintiff faced a risk of serious injury and bodily harm. Moreover, the State placed individuals in charge of the Auto-Body Shop who had no knowledge of the auto-refinishing trade. This conduct was not undertaken in good faith. The State's failure to obtain the Required Safety Devices also resulted from acts or omissions by State employees that were willful or wanton in nature.

39. The State placed David Kalili in the position of Director of Prison Industries. Through this position, Kalili was responsible for the health and safety of all employees at the Auto-Body Shop.

40. In response to questioning, Kalili stated:

7

> Q. Who determined what types of respiratory equipment was to be used with the different chemicals used at the auto-body shop?
>
> A. I would say, based on the need, I guess the final say would be through me.
>
> Q. Explain what qualifications you would have to determine what respiratory equipment was required or necessary for employees working in the spray booth.
>
> A. None.

(Exhibit B (Deposition of David Kalili at p. 58-59)).

41. In or about December of 1996, Plaintiff experienced extreme eye irritations and respiratory distress because of the inadequate ventilation in the spray booth area and inadequate safety devices. Plaintiff reported this to Moore, who ordered Plaintiff to go back to work or be terminated. Plaintiff was compelled to work under these conditions as he was instructed that if he failed to continue to work at the Auto-Body Shop, he would: (i) be issued disciplinary charges; (ii) incur the penalties associated with those charges; (iii) not be permitted to work at another Prison Industries assignment; and (iv) otherwise incur the penalties enumerated under 11 *Del. C.* § 6532.

42. On February 14, 1997, Plaintiff was again ordered by Moore to paint a vehicle in the Auto-Body Shop's spray booth facility without proper ventilation or the Required Safety Devices.

43. Through no fault of his own, Plaintiff was overcome by the toxic fumes present in the spray booth. It was at this time that Plaintiff first became aware that he was sustaining serious permanent injuries to his respiratory system. Doctors have confirmed that Plaintiff's injuries resulted from the cumulative detrimental effect of his overexposure to the toxic fumes present at the Auto-Body Shop. (*See* Exhibits D through F).

8

### C. The State Refuses to Obtain Necessary Permits

44. Applicable federal and State laws and regulations required that the Department of Correction obtain from the Delaware Department of Natural Resources and Environmental Control ("DNREC") a discharge permit to conduct the variety of activities envisioned for the Auto-Body Shop (the "Required Permits").

45. The State failed or refused to obtain the Required Permits. Instead, the State elected to operate under a previously issued permit (the "Wood Refinishing Permit") for the Wood Refinishing Shop.

46. The previous permit for the Wood Refinishing Shop did not encompass the activities envisioned for the Auto-Body Shop.

47. Both the Required Permits and the Wood Refinishing Permit would require that the Auto-Body Shop adhere to the chemical manufacturers' recommended safety procedures. The recommended safety procedures provided that products containing isocynates only be used with the Required Safety Devices.

48. As late as February 5, 1996, Moore informed his superiors at Prison Industries that the Required Permits were necessary for the continued operation of the Auto-Body Shop (Exhibit G). The memorandum Moore wrote to Bower expressly noted that "IT IS IMPERATIVE THAT THE BODYSHOP COMPLY AND ACT WITHIN THESE GUIDELINES. THERE ARE NO EXCEPTIONS." (Exhibit G) (capitalization in original).

49. The DOC never obtained the Required Permits during the time Plaintiff worked at the Auto-Body shop.

50. Had the State obtained the Required Permits, the ventilation of the Auto-Body Shop would no longer have been accomplished merely through cracks in the door. Instead,

sufficient air intake would have been required, and subsequently installed, to accomplish the requisite filtering of contaminants from the exhaust air vented to the environment.

51. Had the State obtained the Required Permits, the conditions present at the Auto-Body Shop would not have been as unsafe and harmful than as compared to the conditions that did in fact exist without the Required Permits.

52. The State's failure to obtain the Required Permits or adhere to the standard of care contemplated by OSHA was the result of a course of conduct undertaken in bad faith or otherwise resulted from the willful or wanton conduct of State employees.

## CAUSE OF ACTION

### Count 1 – Bad Faith and/or Willful or Wanton Conduct

Plaintiff asserts and re-alleges the above cited paragraphs as if fully set forth herein.

53. The DOC was required by applicable federal and State laws and regulations to keep and post MSDS sheets for the chemicals used in the Auto-Body Shop.

54. Plaintiff was forced to work under conditions at the Auto-Body Shop that presented a substantial risk of serious injury as he was compelled to work without the Required Safety Devices.

55. The DOC knew, or should have known, of the serious risk of bodily injury resulting from the unprotected and underprotected exposure to the toxic fumes that the Auto-Body Shop posed to Plaintiff.

56. The DOC acted without requisite good faith when it placed Plaintiff in the work conditions that persisted at the Auto-Body Shop.

10

57. The requisite good faith was lacking given a consideration of, among other causes, the DOC's failure to provide Plaintiff with the Required Safety Devices in spite of the DOC's knowledge of the risk of serious injury resulting from the unprotected or underprotected exposure to the toxic fumes present at the Auto-Body Shop and refusal to obtain the Required Permits.

58. The DOC acted without the requisite good faith when it places grossly unqualified State employees in charge of the Auto-Body Shop.

59. The DOC acted in a willful and wanton manner by subjecting Plaintiff to the harmful conditions that persisted at the Auto-Body Shop without the Required Safety Devices.

60. The DOC acted in a willful and wanton manner when it continued the operation of the Auto-Body Shop despite knowledge of the risk of serious injury presented by the harmful conditions that were present at the Auto-Body Shop and after it was informed of the necessity for the Required Permits to continue operation.

61. The DOC's knowledge of the serious risk that the conditions at the Auto-Body Shop presented is chargeable to it as a result of, among other things, its employees' knowledge of the following:

    i. The information contained in the MSDS sheets;

    ii. The communications from representatives of Wharton & Barnard;

    iii. The requirement to obtain the required DNREC permits;

    iv. Plaintiff's repeated requests for the Required Safety Devices;

    v. The DOC employees' notification that various regulatory and personal safety measures were required to be taken; and

    vi. A general understanding of OSHA requirements and regulations.

WILM1\28988\1 095562.000

62. As a direct and proximate cause of the DOC's acts and omissions, Plaintiff has suffered and continues to suffer from reactive airways disease, vasomotor rhinitis, blurred vision in both eyes as well as other injuries and illness. (*See* Exhibits D through F).

63. The DOC is liable for Plaintiff's injuries as the immunity afforded it under 10 *Del. C.* § 4001 is not applicable or otherwise waived.

WHEREFORE, Plaintiff Larry D. Marvel demands judgment against the State of Delaware Department of Correction as follows:

A. An award of compensatory damages in the amount of $206,500.00, plus compensation for pain and suffering;

B. An award of punitive damages against the DOC in an amount to punish and deter similar conduct in the future;

C. Both pre- and post-judgment interest at the legal rate;

D. Awarding Plaintiff costs and reasonable attorney's fees; and

E. All other relief that the Court deems just and proper.

Dated: March 9, 2005

/s/ David A. Felice
David A. Felice (#4090)
Cozen O'Connor
1201 North Market Street, Suite 1400
Wilmington, DE 19801
Telephone: (302) 295-2000
Facsimile: (302) 295-2013
*Attorneys for Plaintiff Larry D. Marvel*

WILM1\28988\1 095562.000